UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

GARY B. GEE,

              Plaintiff,

     v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

             Defendant.

_____

**DECISION AND ORDER**

13-CV-6396 EAW

## I.    INTRODUCTION

Represented by counsel, Plaintiff Gary B. Gee ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for Supplemental Security Income ("SSI") and Social Security Disability ("SSD") benefits. (Dkt. 1). Presently before the Court are the parties' opposing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 11, 12). For the reasons set forth below, the Commissioner's motion is denied, Plaintiff's motion is granted in part, and this matter is remanded for further administrative proceedings.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Overview

On April 21, 2009, Plaintiff filed an application for SSI and SSD benefits. (Administrative Transcript (hereinafter "Tr.") at 189-282). In his application, Plaintiff

alleged disability due to post-traumatic stress disorder ("PTSD"), depression, lower back injury, left arm injury, and closed head injury. (Tr. 259). Plaintiff's applications for SSD and SSI were initially denied on August 4, 2009. (Tr. 77-84). Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 87-88). On May 16, 2011, Plaintiff, represented by a non-attorney, testified at a hearing before Administrative Law Judge ("ALJ") Jennifer Whang. (Tr. 36-58). Vocational Expert ("VE") Alina Kurtanich[1] also appeared and testified. (Tr. 54-57).

On May 23, 2011, the ALJ issued a decision finding Plaintiff not disabled. (Tr. 61-72). On June 5, 2013, the Appeals Council denied review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4). Plaintiff commenced this civil action appealing the final decision of the Commissioner on August 1, 2013. (Dkt. 1).

## B. The Non-Medical Evidence

Plaintiff was 45 years old on the date of the hearing. (Tr. 42). He last worked driving and unloading trucks in January 2009. (Tr. 43). In March 2009, Plaintiff was involved in a car accident which resulted in the death of his brother and in serious injury to his niece. (Tr. 359).

Plaintiff testified that he lived in an apartment by himself. (Tr. 42). He claimed that he is unable to drive and that he "mostly" takes public transportation to get places, in addition to riding his bike. (Id.) He testified that he attends therapy three times per week

---

[1]     The VE is sometimes referred to in the Administrative Transcript as "Linda Brutanic."

and attends physical therapy three times per week. (Tr. 44). Plaintiff claimed that he was unable to perform household tasks such as cooking, cleaning, laundry, and grocery shopping, and further testified that an aide comes to his home four times per week to assist him. (Tr. 44, 46). Plaintiff testified that he has had an aide since his accident in March 2009. (Tr. 46). According to Plaintiff, his aide also assists him in obtaining his medication. (Tr. 44).

Plaintiff testified that he suffers from violent seizures that sometimes cause him to black out. (Tr. 45). He said that these seizures are controlled by medication (Dilantin) but that the medication causes him to feel "woozy." (*Id.*). Plaintiff further claimed to be taking Abilify (an anti-depressant) and a drug called Fosin for his deviated septim. (Tr. 46). According to Plaintiff, he suffers from side effects of Dilantin including drowsiness and an unwillingness to go outside. (*Id.*). Plaintiff also testified that he was only able to take Abilify while in a "safe, secure environment" because he sometimes did not know what was going to happen when he took it. (Tr. 49).

Plaintiff testified that the accident had "rearranged" his whole life. (Tr. 50). He is now on daily medication. (*Id.*). Plaintiff claimed that he has people calling him and visiting him to remind him to take his medication. (Tr. 51). Plaintiff further testified that his aide helped him with "hygiene stuff," including bathing, but that he was able to brush his own teeth. (*Id.*). He stated that his aide cooks for him. (*Id.*). Plaintiff further testified that he receives services from Meals on Wheels. (Tr. 52). Plaintiff also claimed that he has "memory issues" and that his memory is "not good." (*Id.*).

- 3 -

Plaintiff testified that after his accident, he was not able to sit for more than 30 minutes to an hour without pain. (Tr. 47). Plaintiff further claimed to be unable to lift due to a previous shoulder injury. (*Id.*). Plaintiff testified that he sometimes suffered from falls as a result of his seizure disorder. (Tr. 49). He recounted an incident in which he had a seizure while on a ladder and fell and injured himself. (*Id.*).

At the time of the hearing, Plaintiff testified that he was seeing a therapist named "Deborah" and a psychologist named "Dr. Matthews," from Rochester Rehabilitation. (Tr. 48). Plaintiff explained that he suffered from flashbacks to his accident and that he was unable to leave his home as a result. (*Id.*).

## C.     Vocational Expert's Testimony

VE Alina Kurtanich also testified before ALJ Whang. (Tr. 54-58). VE Kurtanich testified that Plaintiff had previously been employed as a truck driver and a warehouse worker. (Tr. 55-56). The ALJ presented VE Kurtanich with a hypothetical question. (Tr. 56). The VE was asked to consider someone of Plaintiff's age, education, and experience who could perform light work; required a sit/stand option every 30 minutes; should never climb ladders, ropes, or scaffolds; should avoid hazards, including moving machinery and unprotected heights; was limited to simple, routine, and repetitive tasks; requires a low-stress job, defined as having only occasional decision-making and occasional changes in the work setting; and should have only occasional direct interaction with the public. (*Id.*). The VE testified that a hypothetical individual with these abilities and restrictions would not be able to perform any of Plaintiff's past work. (*Id.*). The VE further testified that a hypothetical individual with these abilities and restrictions would

be able to perform occupations that existed in significant numbers in the national economy, including marker, garment sorter, and electronic worker. (Tr. 56-57).

The ALJ asked the VE to consider a hypothetical individual with the abilities and restrictions listed above, but whom was limited to sedentary work. (Tr. 57). The VE testified that such a hypothetical individual would be able to perform occupations that existed in significant numbers in the national economy, including surveillance system monitor, document preparer, and credit checker. (*Id.*).

Finally, the ALJ asked the VE to consider a hypothetical individual with the abilities and restrictions listed above who had any of the additional limitations: (1) expected to be off task more than 20 percent of the day due to concentration issues; (2) would require unscheduled breaks; or (3) would be absent more than three times per month. (*Id.*). The VE testified that "[e]ach one of those additional limitations by itself precludes the claimant from any employment in the national economy. . . ." (*Id.*).

### D. Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized below.

On March 2, 2009, Plaintiff was treated at Crittendon Hospital Medical Center in Rochester, Michigan, following a motor vehicle accident. (Tr. 336). Plaintiff was seen in the emergency department. (*Id.*). Plaintiff reported that he had hit his head on the glass and that he had a headache with pain at a level of nine out of ten. (*Id.*). Plaintiff also complained of pain in his left ribs. (*Id.*). A CAT scan of the brain revealed no acute intracranial process and a rib study showed no fracture. (Tr. 337, 339-40). Plaintiff was

- 5 -

diagnosed with (1) acute motor vehicle accident; (2) acute left rib contusion; and (3) scalp contusion with cephalalgia. (Tr. 337). He was given a prescription for Darvocet and instructed to follow up in three days. (*Id.*).

On March 21, 2009, Plaintiff was treated in the emergency department at William Beaumont Hospital. (Tr. 348-54). He complained of left arm pain, groin pain, rib pain, and hematuria (blood in urine). (Tr. 349). Plaintiff had abrasions on his left forearm from which glass was removed and had left shoulder pain upon examination. (*Id.*).

On May 21, 2009, David M. Cowan, Ph.D., and Sylvia A. Malcore, M.A., performed an intake evaluation on Plaintiff. (Tr. 359-61). Plaintiff was referred for this evaluation by M. Khan, M.D., due to PTSD and depression. (Tr. 359). Dr. Cowan and Ms. Malcore's report indicates that Plaintiff reported anxiety, flashbacks, feelings of helplessness, decreased energy, suicidal ideation, and depression. (*Id.*). Plaintiff was suffering from sleep difficulties and reported past trauma (including witnessing a shooting and physical altercations with his step-father) and a previous suicide attempt. (*Id.*). Dr. Cowan and Ms. Malcore observed that Plaintiff did not make regular eye contact, frequently stared at his feet, was disorganized in his presentation, and had difficulty remembering the details of his treatment history. (Tr. 360).

Dr. Cowan and Ms. Malcore observed that Plaintiff's depression had been aggravated by the accident in March 2009. (*Id.*). They further observed that he had isolated himself and avoided social interaction as a result of his anxiety. (*Id.*). They determined the following diagnoses: (1) major depression, recurrent, with psychotic features (provisional), aggravated by motor vehicle accident; (2) PTSD, secondary due to

motor vehicle accident; and (3) learned insomnia associated with major depression and PTSD.[2] (Tr. 361). Dr. Cowan and Ms. Malcore recommended a course of cognitive-behavioral psychotherapy and medication management of Plaintiff's symptoms. (*Id.*). They recommended a psychiatric referral and follow-up. (*Id.*).

On May 28, 2009, Plaintiff treated with Dr. Cowan and Ms. Malcore for individual cognitive-behavioral therapy. (Tr. 362). Plaintiff and his providers discussed initial treatment goals. (*Id.*). Plaintiff reported having a great deal of difficulty falling and remaining asleep and reported having flashbacks to the March 2009 accident and his brother's death. (*Id.*).

On June 18, 2009, Plaintiff treated with Dr. Cowan and Ms. Malcore for individual cognitive-behavioral therapy. (Tr. 363). His treatment goals included reduction of depressive and anxiety symptoms and improvement of learned insomnia. (*Id.*). Plaintiff reported several failed attempts at having received a medically necessary MRI due to his "overwhelming terror" of the procedure. (*Id.*).

On July 22, 2009, non-examining state agency psychological consultant F. Kladder, Ph.D., completed a psychiatric review technique form and mental residual functional capacity assessment form with respect to Plaintiff. (Tr. 364-81). Dr. Kladder considered whether Plaintiff suffered from affective disorders and/or anxiety-related disorders. (Tr. 364). Dr. Kladder identified a medically determinable impairment of recurrent major depressive disorder with psychotic features. (Tr. 367). Dr. Kladder also

---

[2]     Dr. Cowan and Ms. Malcore also indicated they needed to rule out schizoaffective disorder and schizophrenia. (Tr. 361).

identified a diagnosis of anxiety evidenced by recurrent and intrusive recollections of a traumatic experience. (Tr. 369). Dr. Kladder assessed Plaintiff with mild limitations in restriction of activities of daily living and in difficulties in maintaining social functioning. (Tr. 374). He assessed Plaintiff with moderate difficulties in maintaining concentration, persistence, or pace. (*Id*.). Dr. Kladder assessed Plaintiff as appearing capable of unskilled work. (Tr. 376).

On July 27, 2009, state agency consultant E. Montasir, M.D., completed a consultative medical examination of Plaintiff. (Tr. 383-390). Dr. Montasir's physical examination revealed Plaintiff was morbidly obese, in no acute distress, had normal gait and stance, and did not use a cane. (Tr. 384). Plaintiff could perform a full squat, heel and toe walk, get on and off the examination table satisfactorily, had full range of motion with all joints, and exhibited a negative straight leg raise of 75 degrees bilaterally. (*Id.*). Plaintiff was alert and oriented, his sensory functions were intact, and his muscle tone was normal. (Tr. 385). Plaintiff exhibited slightly reduced lumbar range of motion. (Tr. 386). His fine and gross dexterity was intact and he had good grip strength and no muscle atrophy. (Tr. 385). Dr. Montasir diagnosed osteoarthritis and spinal disorder. He opined Plaintiff would be able to work a full eight-hour day with no limitations "as far as his physical condition is concerned." (*Id*.). Dr. Montasir indicated that Plaintiff could not stoop or squat. (Tr. 388).

On December 8, 2009, Dr. Cowan and Ms. Malcore provided a letter in which they indicated Plaintiff had been seen for thirteen treatment sessions. (Tr. 395). They

reiterated diagnoses of (1) severe recurrent major depression; (2) PTSD; and (3) learned insomnia. (*Id.*).

On July 25, 2010, Plaintiff was treated at the emergency department at Rochester General Hospital in Rochester, New York. (Tr. 398). He was prescribed Dilantin. (*Id.*).

On November 4, 2010, Thomas McElligott, M.D., completed a seizure disorder medical report for Plaintiff. (Tr. 404-07). Dr. McElligott observed that Plaintiff suffered from a grand mal seizure disorder as a result of a traumatic brain injury and that he was taking Dilantin. (Tr. 404-05). Dr. McElligott noted that Plaintiff had suffered from six seizures in the previous year. (Tr. 405). Dr. McElligott further observed memory loss due to seizures, depression, and traumatic brain injury, and opined that Plaintiff would be unable to work. (*Id.*). Dr. McElligott noted that Plaintiff was also being treated for depression and PTSD; that Plaintiff was unable to lift, carry, or stand; and that Plaintiff was receiving physical therapy. (Tr. 405-07).

On February 5, 2011, Plaintiff treated with Marc Schieber, M.D., at Unity Rehab and Neurology at Ridgeway. (Tr. 417-18). Dr. Schieber noted that Plaintiff had been referred by Dr. McElligott for consultation regarding post-traumatic epilepsy. (Tr. 417). Dr. Schieber noted that Plaintiff had a history of PTSD and depression and had "persistent difficult with memory" following his motor vehicle accident. (*Id.*). Dr. Schieber determined that Plaintiff suffered from post-traumatic epilepsy and could not drive, use ladders, or take baths, and required regular sleep. (Tr. 418).

On March 25, 2011, Wendy Rosen, M.D., a psychiatrist with the Rochester Rehabilitation Center, completed a mental health services recovery and treatment plan for

Plaintiff. (Tr. 419-22). Dr. Rosen noted that Plaintiff complained of flashbacks, nightmares, social isolation, depression, difficulty sleeping, weight loss, difficulty concentrating, and auditory hallucinations. (Tr. 419). Plaintiff was diagnosed with PTSD; major depressive disorder, severe with psychotic features; and anxiety disorder. (Tr. 419).

> ### E.    New and Additional Medical Evidence Submitted by Plaintiff

In connection with his Motion for Judgment on the Pleadings, Plaintiff has submitted additional medical evidence. (Dkt. 12-4 to 12-8). The Court assumes familiarity with this additional medical evidence and briefly summarizes it below.

On January 25, 2011, Plaintiff treated with Dr. McElligott at Health Reach Clinic at West Main. (Dkt. 12-4 at 2-5). Dr. McElligott observed that Plaintiff had a seizure disorder and had fallen and injured his hip the previous week. (*Id.* at 2). Plaintiff was noted to have chronic problems including brain injury, lower back pain, epilepsy, depression, and PTSD. (*Id.*).

On April 20, 2011, Plaintiff treated at Rochester Rehabilitation Center and an addendum to his recovery and treatment plan was created. (Dkt. 12-5 at 2). Plaintiff's treatment plan included biweekly psychotherapy with Debra Streisel, M.H.C. (*Id.*).

On May 3, 2011, Ms. Streisel completed a psychosocial intake evaluation. (*Id.* at 7-9). Ms. Streisel indicated that Plaintiff had been seen for treatment on February 24, 2011; March 10, 2011; March 25, 2011; and April 18, 2011. (*Id.* at 7). Plaintiff appeared anxious and depressed. (*Id.* at 8). He reported auditory hallucinations and flashbacks. (*Id.*). Ms. Streisel noted chronic pain, frequent seizures, and short-term memory loss

related to his accident. (*Id.* at 9). Plaintiff was noted to be "unable to work due to his injuries and restrictions they necessitate." (*Id.*)

On May 27, 2011, Dr. Rosen completed a Mental Health Services Treatment Plan Review for Plaintiff. (Dkt. 12-5). Dr. Rosen noted that Plaintiff had met with Thankamma Mathew, M.D., treating psychiatrist. (*Id.* at 3).

Dr. Mathew completed a Psychiatric Intake Evaluation for Plaintiff on May 10, 2011. (Dkt. 12-5 at 4-6). Dr. Mathew noted that Plaintiff suffered from chronic PTSD, traumatic brain injury, and seizure disorder. (*Id.* at 5-6)

On July 5, 2011, Dr. McElligott completed a Physical Assessment for Determination of Employability form for the Monroe County Department of Human Services. (Dkt. 12-6). Dr. McElligott indicated he had been treating Plaintiff since July 27, 2010, with nine evaluations in the past 12 months. (*Id.* at 2). Dr. McElligott noted that Plaintiff "appears permanently disabled, condition is not expected to improve and is unable to participate in any activities" due to memory loss and seizure disorder due to traumatic brain injury, depression, and PTSD. (*Id.* at 3). Dr. McElligott assessed Plaintiff as "chronically and totally disabled." (*Id.*). Dr. McElligott diagnosed Plaintiff with brain injury, seizures, sleep apnea, depression, and PTSD. (*Id.* at 4).

With respect to estimated functional limitations in an eight hour work day, Dr. McElligott opined that Plaintiff could not do the following for more than two to four hours: (1) walking; (2) standing; (3) pushing, pulling, bending; (4) seeing, hearing, speaking; and (5) ability to lift/carry. (*Id.* at 5).

On July 12, 2011, Dr. Mathew completed a Psychiatric Assessment for Determination of Employability form for the Monroe County Department of Human Services. (Dkt. 12-7). Dr. Mathew noted that he had been treating Plaintiff since February 24, 2011, with nine evaluations in the past 12 months. (*Id.* at 2). Dr. Mathew diagnosed Plaintiff with chronic PTSD. (*Id.*). With respect to functional limitations, Dr. Mathew opined that Plaintiff had normal function with respect to his capacity to follow and understand simple instructions and directions, but was unable to function 10-25% of the time in the following: (1) perform simple and complex tasks independently; (2) maintain attention and concentration for rote tasks; (3) regularly attend to a routine and maintain a schedule; (4) maintain basic standards of hygiene and grooming; and (5) perform low stress and simple tasks. (*Id.* at 4). Dr. Mathew assessed Plaintiff as limited to participating in activities for only eight to sixteen hours per week with reasonable accommodations. (*Id.*).

On July 25, 2011, Christina Caldwell, Psy.D., performed a consultative psychiatric evaluation of Plaintiff. (Dkt. 12-8). Dr. Caldwell assessed Plaintiff's manner of relating, social skills, and overall presentation as poor. (*Id.* at 3). Plaintiff's attention and concentration were found to be mildly impaired due to limited intellectual functioning. (*Id.*). Dr. Caldwell diagnosed Plaintiff with depressive disorder, NOS; anxiety disorder, NOS; panic disorder with agoraphobia; and cognitive disorder. (*Id.* at 5). In the medical source statement section of the report, Dr. Caldwell opined:

> The claimant is able to follow and understand simple directions and instructions. He is limited in his ability to perform simple tasks independently. He is limited in his ability to maintain attention and

concentration.  He is limited in his ability to maintain a regular schedule.
He is limited in his ability to learn new tasks.  He is unable to perform
complex tasks independently.  He is unable to make appropriate decisions.
He is unable to relate adequately with others.  He is unable to appropriately
deal with stress.

(*Id.* at 4-5).

### F.     Determining Disability Under the Social Security Act and the ALJ's Decision

For both Social Security Insurance and Disability Insurance Benefits, the Social

Security Act provides that a claimant will be deemed to be disabled "if he is unable to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which . . . has lasted or can be expected to last for a

continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see*

*Rembert v. Colvin*, No. 13-CV-638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014).

A disabling impairment is defined as "an impairment that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostics techniques."  42 U.S.C. §§ 423(d)(3),

1382c(a)(3)(D).  The burden is on the claimant to demonstrate that he is disabled within

the meaning of the Act.  *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002).

The individual will only be declared disabled if his impairment is of such severity that he

is unable to do his previous work and cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful activity.  42 U.S.C.

§§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination of disability at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). These five steps are followed:

1.      The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.      If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.      If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.      If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.      If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

In applying the five-step sequential evaluation in this matter, ALJ Whang made the following determinations. At step one, the ALJ found that Plaintiff was not engaged in substantial gainful activity during the relevant timeframe. (Tr. 66). At step two, the ALJ determined that Plaintiff had the following severe impairments: seizures, osteoarthritis, spinal disorder, major depression, and PTSD. (*Id.*). However, the ALJ stated that Plaintiff did not meet or equal any listed impairment under step three. (Tr.

- 14 -

67).  At step four, the ALJ evaluated Plaintiff's residual functional capacity ("RFC") and

found that Plaintiff could:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)
> except [Plaintiff] must have a job that allows him to alternate positions
> between sitting and standing every 30 minutes; he must never climb
> ladders, ropes, or scaffolds; and he must avoid hazards, including moving
> machinery and unprotected heights.  He is limited to simple, routine, and
> repetitive tasks; requires a low stress job, defined as having only occasional
> decision making and only occasional changes in the work setting; and
> should have only occasional direct interaction with the public.  (Tr. 68).

The ALJ also determined at step four that Plaintiff could not perform his past relevant

work.  (Tr. 70-71).  At step five, the ALJ relied on the testimony of VE Alina Kurtanich

to find that Plaintiff was capable of performing work in representative occupations such

as marker, garment sorter, and electronic worker.   (Tr. 71).   The ALJ ultimately

concluded that Plaintiff was not disabled or entitled to disability insurance benefits.

(Tr. 72).

## III.   Discussion

### A.   Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under

42 U.S.C. §§ 405(g) and 1383(c)(3).  "In reviewing a decision of the Commissioner, a

court may 'enter, upon the pleadings and transcript of the record, a judgment affirming,

modifying, or reversing the decision of the Commissioner of Social Security, with or

without remanding the cause for a rehearing.'" *Rehr v. Barnhart*, 431 F. Supp. 2d 312,

317 (E.D.N.Y. 2006) (quoting 42 U.S.C. § 405(g)).  42 U.S.C. § 405(g) directs the Court

to accept findings of fact made by the Commissioner, so long as the findings are

- 15 -

supported by substantial evidence in the record.    Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating Plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence on the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (stating that a reviewing Court does not examine a benefits case *de novo*).  If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Judgment on the pleadings may be granted under Rule 12(c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

**B.    Duty to Develop the Record and the Treating Physician Rule**

Plaintiff argues that the ALJ and the Appeals Council both failed to fulfill their duty to develop the record in this matter. (Dkt. 12-1 at 24-27).

Although "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act . . . because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and brackets omitted). "[A]n ALJ may not rely, as factfinders in adversarial proceedings customarily do, on the *absence* of probative evidence supporting the opinions of a claimant's expert, without making an affirmative effort to fill any gaps in the record before him." *Thomas v. Barnhart*, No. 01 Civ. 518(GEL), 2002 WL 31433606, at *4 (S.D.N.Y. Oct. 30, 2002) (emphasis in original). "In fact, where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history. . . ." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). "Ultimately, 'it is the ALJ's duty to investigate and develop the arguments both for and against the granting of benefits.'" *Amrock v. Colvin*, No. 3:12-CV-55(FJS), 2014 WL 1293452, at *4 (N.D.N.Y. Mar. 31, 2014) (quoting *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004)). "This affirmative obligation is present even when counsel represents the claimant." *Id.* "The duty to develop the record extends to the Appeals Council." *Butler v. Astrue*, 926 F. Supp. 2d 466, 477 (N.D.N.Y. 2013).

However, "the affirmative duty imposed on an ALJ to develop an administrative record fully is not without limits." *Amrock*, 2014 WL 1293452, at *4. The ALJ is not

required to "obtain every medical file from every medical source the claimant has seen." *Ubiles v. Astrue*, No. 11-CV-6340T(MAT), 2012 WL 2572772 at *10 (W.D.N.Y. July 2, 2002). The ALJ is only required to "request additional evidence if the administrative record does not contain sufficient evidence to make a fair determination." *Id.* Indeed, "[o]n the 'flip-side' of this same proposition, 'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'" *Hart v. Colvin*, No. 12-CV-1043-JTC, 2014 WL 916747, at *7 (W.D.N.Y. Mar. 10, 2014) (quoting *Petrie v. Astrue*, 412 Fed. App'x 401, 406 (2d Cir. 2011)).

In this case, Plaintiff argues that there were obvious gaps in the administrative record and that these gaps rendered the ALJ unable to assess Plaintiff's RFC. In particular, Plaintiff argues that the ALJ failed to fulfill her obligation to seek information from Plaintiff's treating physician(s) and that her RFC determination was therefore not supported by substantial evidence. The Court agrees.

The record in this case contained little information from treating sources regarding Plaintiff's limitations as a result of his PTSD and major depressive disorder. Although Dr. Cowan and Ms. Malcore indicated they had treated Plaintiff on 13 occasions (Tr. 395), the record contained treatment records for only three of these sessions (Tr. 359-63). In November 2010, Dr. McElligott specifically noted that Plaintiff was being treated for PTSD and depression (Tr. 405), yet the administrative record contains no records of this treatment. At the hearing before ALJ Whang, Plaintiff explicitly stated that he was

receiving mental health treatment from Dr. Mathew at the Rochester Rehabilitation Center. (Tr. 48). The administrative record did not contain any medical records from Dr. Mathew, and the ALJ seemingly did not make any effort to obtain such records despite having found that PTSD and major depression were severe impairments at step two. These gaps in the administrative record were obvious and substantial, and the ALJ's failure to fill them renders remand appropriate. *See Dambrowski v. Astrue*, 590 F. Supp. 2d 579, 585 (S.D.N.Y. 2008) (remand is appropriate where the ALJ has failed to sufficiently develop the administrative record).

Additionally, the gaps in the administrative record rendered the ALJ's RFC determination faulty. "The question of whether the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity necessarily dovetails with the 'treating physician rule,' which mandates that the opinion of a claimant's treating physician regarding the nature and severity of [the claimant's] impairments be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Swanson v. Colvin*, No. 12-CV-645S, 2013 WL 5676028, at *5 (W.D.N.Y. Oct. 17, 2013) (internal quotation omitted) (alterations in original). "As a result, the opinion of a treating physician is an especially important part of the record to be developed by the ALJ" and "[w]hen the ALJ perceives a gap in the record concerning the findings of a treating physician, the ALJ has an affirmative obligation to seek out the missing information." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 343-44 (E.D.N.Y. 2010).

In this case, the administrative record contained no information from a treating mental health physician regarding Plaintiff's mental functional abilities and limitations. There is no indication in the record that the ALJ sought out such information or contacted Plaintiff's treating physician(s) to request such an assessment.    Under these circumstances, remand is appropriate. *See Swanson*, 2013 WL 5676028, at *5; *Clobridge v. Astrue*, No. 5:07-CV-00691 NAM, 2010 WL 3909500, at *8 (N.D.N.Y. Sept. 30, 2010).

### C.    New Medical Evidence Provided by Plaintiff

As discussed above, Plaintiff has submitted significant additional medical evidence in connection with his Motion for Judgment on the Pleadings. (Dkt. 12-4 to 12-8).  Plaintiff contends that the Court should remand this case for evaluation of this "new and material evidence." (Dkt. 12-1 at 17).

"The Social Security Act permits remand for review of new and material evidence pursuant to the sixth sentence of § 205(g), 42 U.S.C. § 405(g), which provides in pertinent part that '[t]he court . . . may at any time order additional evidence to be taken before the Commissioner, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . . .'" *Geracitano v. Callahan*, 979 F. Supp. 952, 958 (W.D.N.Y. 1997). "In order to justify remand under this provision, the plaintiff must show (1) that the proffered evidence is 'new' and not merely cumulative of what is already in the record, (2) that the evidence is material, i.e., both relevant to the claimant's

condition during the time period for which benefits were denied and probative, and (3) good cause for failing to present the evidence earlier." *Id.*

Here, having reviewed the evidence at issue, the Court is satisfied that at least some portion of the proffered evidence is both new and material. For example, the Psychiatric Assessment for Determination of Employability form completed by treating psychiatrist Dr. Mathew contains information not found elsewhere in the record, is relevant to the issue of Plaintiff's condition during the time period at issue[3], and is probative of Plaintiff's RFC. In particular, Dr. Mathew stated that Plaintiff was unable to maintain attention and concentration for rote tasks 10-25 percent of the time. (Dkt. 12-7 at 4). At the hearing, the VE indicated that an individual with the limitations set forth by the ALJ who was expected to be off task more than 20 percent of the day due to concentration issues would not be employable in the national economy. (Tr. 57). Dr. Mathew's assessment of Plaintiff is thus highly probative of his disability status.

Plaintiff has also established "good cause" for having failed to present this evidence at an earlier stage of the proceedings. The record indicates that on July 13, 2011, Kelly Laga, Esq., advised the Appeals Council that she represented Plaintiff and

---

[3]     The time period at issue is between the alleged onset date of August 21, 2004, and May 23, 2011, because Plaintiff filed a subsequent application for SSDI benefits and SSI benefits and was found disabled as of May 24, 2011. (*See* Dkt. 12-3). Although Dr. Mathew's psychiatric assessment is dated July 12, 2011, and was therefore retrospective, retrospective opinions of treating physicians are relevant and binding unless contradicted by other medical evidence. *Fuller v. Astrue*, No. 09-CV-6559, 2010 WL 3516935 (W.D.N.Y. Sept. 7, 2010); *see also Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004) (district court erred in refusing to consider new evidence simply because it postdated the ALJ's decision).

requested a copy of the record in Plaintiff's case. (Tr. 33). Prior to this date, the record does not reflect Plaintiff having been represented by counsel. Steve Hall, who appeared with Plaintiff before the ALJ, is a non-attorney. (Tr. 64).

The Appeals Council apparently erroneously provided the requested information to Mr. Hall instead of to Ms. Laga. (Tr. 23-30). Plaintiff's current counsel, Mr. Goldstein, took the case over from Ms. Laga and informed the Appeals Council on both March 13, 2013, and March 25, 2013, that he was unable to access Plaintiff's file. (Tr. 13-14). On March 29, 2013, Plaintiff's counsel made a request for additional time to submit additional evidence in this case and informed the Appeals Council that he still was not able to access Plaintiff's file. (Tr. 12). Also on March 29, 2013, the Appeals Council sent a letter to Plaintiff's counsel stating "[w]e are not enclosing copies of the exhibits and/or digital recording you requested because you have access to the electronic folder. . . ." (Tr. 5). Despite this representation from the Appeals Council, Plaintiff's counsel continued to be unable to access Plaintiff's file throughout April 2013. (Dkt. 19-1, 19-2).

The Administrative Transcript does not reflect any response from the Appeals Council to Plaintiff's counsel's request for additional time dated March 29, 2013. Instead, on June 5, 2013, apparently without having resolved the access issue, the Appeals Council denied Plaintiff's request for review. (Tr. 1).

Without the ability to review the administrative record, it is reasonable that Plaintiff's counsel was unable to determine which records needed to be obtained and which records should be submitted to the Appeals Council. Under these circumstances,

Plaintiff has adequately demonstrated good cause for having failed to submit the new and material evidence to the Appeals Council. *See Miller v. Barnhart*, No. 03 CIV. 2072 (MBM), 2004 WL 2434972, at \*10 (S.D.N.Y. Nov. 1, 2004) (administrative error may constitute good cause for failure to present evidence). The Court therefore finds that remand is appropriate to permit the Commissioner to consider the new and material evidence presented by Plaintiff.

### D.    Credibility Analysis

Finally, Plaintiff contends that the ALJ failed to apply the appropriate legal standards when finding him not fully credible. (Dkt. 12-1 at 27-29). The Social Security regulations require a two-step process for the ALJ to consider the extent to which subjective evidence of symptoms can reasonably be accepted as consistent with the medical and other objective evidence. *Brownell v. Comm'r of Soc. Sec.*, No. 1:05-CV-0588 (NPM/VEB), 2009 WL 5214948, at \*3 (N.D.N.Y. Nov 23, 2009). First, the ALJ considers whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a). Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects" of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(b). When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the credibility of the claimant's statements considering the details of the case

record as a whole. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).

Here, in considering Plaintiff's credibility, the ALJ properly applied the two step analysis. First, the ALJ found that Plaintiff's medically determinable impairments could be expected to cause the alleged symptoms. (Tr. 70). Second, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." (*Id.*). The ALJ considered and cited to various parts of Plaintiff's testimony as well as the medical evidence in reaching this conclusion. (*Id.*).

"The ALJ 'has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment . . . [which he must do] in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant.'" *King v. Astrue*, No. 12-CV-6186T, 2013 WL 3154129, at *8 (W.D.N.Y. June 21, 2013) (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)) (alteration in original). "If, 'after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, the ALJ decides to discredit plaintiff's claim of severe and disabling pain, that decision is supported by substantial evidence.'" *Drennen v. Astrue*, No. 10-CV-6007MAT, 2012 WL 42496, at *6 (W.D.N.Y. Jan. 9, 2012) (quoting *Pascariello v. Heckler*, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)).

The Court cannot conclude that the ALJ committed a legal error in conducting her credibility analysis of Plaintiff's testimony. However, the Commissioner may discover on remand that the current RFC should be revised due to the additional medical information provided by Plaintiff's treating physician[s]. In that event, the

Commissioner is directed to re-evaluate the credibility of Plaintiff's claims in light of the weight assigned to the medical evidence on remand.

## IV.    CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 11) is denied, Plaintiff's motion for judgment on the pleadings (Dkt. 12) is granted in part, and this matter is remanded for further administrative proceedings consistent with this Decision and Order.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:          September 30, 2014
                Rochester, New York